# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SEAN CECCHINI,
     Plaintiff,

     v.

PHILLIP K. SCHENCK, JR., PAUL B. HAMMICK,
STEPHEN HAJDASZ, MATTHEW WILLAUER,
RICHARD BOWEN, TOWN OF BLOOMFIELD,
and ARTHUR FREDERICKS,
     Defendants.

No. 3:14-CV-1704 (MPS)

## RULING AND ORDER

The plaintiff, Sean Cecchini, is a police officer for the Town of Bloomfield, Connecticut. He brings this case under 42 U.S.C. § 1983 against the Town of Bloomfield, its Town Manager, the Chief of Police, and several employees of the Bloomfield police department. In his six-count Second Amended Complaint (ECF No. 28), Cecchini claims that (1) the defendants retaliated against him in violation of the First Amendment, (2) the defendants intentionally inflicted emotional distress, (3) the Town of Bloomfield violated his rights under the First and Fourteenth Amendments, (4) the defendants are liable under Conn. Gen. Stat. § 52-557n, which, *inter alia*, makes political subdivisions of the state responsible for certain negligent acts by their agents, (5) the defendants committed the tort of aiding and abetting, and (6) the defendants retaliated against him in violation of the First Amendment after he filed this lawsuit. The plaintiff seeks compensatory and punitive damages, a declaratory judgment, nominal damages, attorney's fees under 42 U.S.C. §§ 1983 and 1988, attorney's fees under the common law, the costs of this action, and other equitable relief.

For the reasons discussed below, the defendants' motion is granted in part and denied in part. Count One is dismissed against the individual defendants in their official capacities. Count

Two is dismissed as to all of the defendants except for Richard Bowen. I do not dismiss Count Three because the defendants moved to dismiss only the equal protection claim in that count, which the plaintiff subsequently has withdrawn. Counts Four and Five are dismissed in their entirety. Finally, I grant the motion to dismiss Count Six as to Phillip Schenck and deny the motion as to the remaining defendants.

The following counts remain: the claim in Count One against the Town of Bloomfield and the individual defendants in their individual capacities, the claim in Count Two against Bowen, the claim in Count Three against the Town of Bloomfield under the First Amendment, and the First Amendment Claim in Count Six against the Town of Bloomfield, Hammick, Hajdasz, Willauer, Fredericks, and Bowen.

## I.    Background

### A.    Factual Allegations

As best as can be determined from the erratic chronology in the Second Amended Complaint, the plaintiff makes the following allegations.

#### 1.    The Parties

Sean Cecchini has been a police officer for the defendant Town of Bloomfield and a member of the local police union since 1996. (ECF No. 28 at ¶¶ 6, 18.) He was a "union steward" from 2003 to 2004 and union president from 2005 to 2010. (*Id.* at ¶ 65–66.) Phillip K. Schenck, Jr. is the Town Manager of Bloomfield. (*Id.* at ¶¶ 7, 16.) Paul B. Hammick is the chief of police for the Bloomfield police department. (*Id.* at ¶¶ 8, 17.) Stephen Hajdasz is a captain for the Bloomfield police. (*Id.* at ¶ 9.) Matthew Willauer is a lieutenant for the Bloomfield police. (*Id.* at ¶ 10.) Richard Bowen was a police officer who later became a sergeant for the Bloomfield police. (*Id.* at ¶ 12.) Arthur Fredericks is a lieutenant for the Bloomfield police. (*Id.* at ¶ 11.)

### 2. *Cecchini Reports Misconduct in the Police Department*

In 2011, the plaintiff saw Bowen stop a car with three young black teenagers, grab the genitals of one of them, and threaten the teenagers that a police dog would attack them if they did not produce marijuana, which Bowen falsely accused them of possessing. (*Id.* at ¶¶ 21–22.) The plaintiff told the teenagers that the police dog would not bite them. (*Id.* at ¶ 23.) Bowen and two officers then unsuccessfully looked for marijuana in the car. (*Id.* at ¶ 24.) The plaintiff described Bowen's conduct to the shift supervisor, Sergeant Bolden, who told the plaintiff to write a report. (*Id.* at ¶ 25–26.) After the plaintiff reported the incident, Bowen entered false information into the "computer dispatch and report system." (*Id.* at ¶¶ 27–28.) Chief Hammick and the patrol division commander did not act on the plaintiff's report. (*Id.* at ¶ 29.)

Next, Willauer confronted the plaintiff about whether the plaintiff told the NAACP about Bowen's alleged misconduct. (*Id.* at ¶ 30.) As a result, the plaintiff was "harassed and intimidated from speaking to anyone" about what he saw. (*Id.* at ¶ 31.) The plaintiff complained to Schenck and Bloomfield's human resources director who refused to end the "retaliation." (*Id.* at ¶ 32.)

### 3. *The Defendants Treat Cecchini Poorly and Deny Him Promotions*

In 2012, unlike every other officer, the plaintiff was not issued a new bullet-proof vest. (*Id.* at ¶ 39.) Willauer said "I don't care if [the plaintiff] gets shot." (*Id.*) That same year, the plaintiff sat for the "Sergeant examination, which was a corrupt process in which the plaintiff's score and position were inexplicably and maliciously changed, preventing him from obtaining the promotion." (*Id.* at ¶ 84.) In 2013, three officers, including the plaintiff, applied for promotion to detective. (*Id.* at ¶ 85.) One applicant was promoted to sergeant, "leaving only two applicants for detective, which included the plaintiff." (*Id.* at ¶ 86.) The plaintiff was not

3

promoted because Hammick "falsely claimed the 'list' for detective was no longer valid because there were not three candidates . . . ." (*Id.* at ¶¶ 85–87.) At some time in 2014, the plaintiff was one of two applicants seeking to become a sergeant but the plaintiff was not promoted because Hammick "falsely stated that the promotion list was invalid." (*Id.* at ¶ 88.) The actual reason, according to the plaintiff, was that Hammick wanted to retaliate against the plaintiff for his union membership and other speech activities. (*Id.* at ¶ 90.) The plaintiff also alleges that all of the defendants coordinated to deny the plaintiff a promotion to sergeant and detective, although he does not say how. (*Id.* at ¶ 78.)

### 4.    *Cecchini Testifies for the Police Union*

Around February 2013, all of the defendants, besides Schenck, subjected police officer Donald Rajtar to discipline for working unauthorized overtime. (*Id.* at ¶¶ 67–70.) The plaintiff "grieved" Rajtar's discipline because department policies required officers to obtain permission to work overtime but also required them to complete certain reports even if that meant working extra hours. (*Id.* at ¶¶ 67–70.) The plaintiff signed a statement that Rajtar circulated, which stated:

> Currently, in the Patrol Division there are certain cases (i.e. arrests, missing persons, criminal domestic disputes, other serious cases, etc.) that when assigned to me, I am aware that I must complete the initial report even if I go beyond the end of my normal shift. This will be paid overtime and could be without the request of or by supervision.

(*Id.* at ¶ 71–72.) Later, the plaintiff testified at Rajtar's hearing on behalf of the union. (*Id.* at ¶ 74.)

After the hearing, the defendants would not provide accurate or timely performance evaluations of the plaintiff. (*Id.* at ¶ 75.) The plaintiff complained but the defendants would not process his grievance. (*Id.* at ¶ 75.) This was intimidating and harassing to the plaintiff and was "facilitated" by Hajdasz, Hammick, and Schenck. (*Id.* at ¶ 76.)

### 5.  *Cecchini Is Investigated and Reprimanded for Misconduct*

Schenck allegedly "refused to afford plaintiff his rights under the collective bargaining agreement and conspired with Hammick and Hajdasz to retaliate against the plaintiff." (*Id.* at ¶ 77.) The defendants sought to prevent him from receiving a promotion and would not investigate the plaintiff's claims about corruption within the department, even though they were aware of it. (*Id.* at ¶ 78.)

In April 2013, Willauer and Bowen brought disciplinary charges against the plaintiff after Bowen found a uniform shirt that did not belong to the plaintiff in the plaintiff's locker. (*Id.* at ¶ 79–81.) Willauer questioned the plaintiff "excessively and without notice or union representation." (*Id.* at ¶ 82.) The plaintiff met with Haljdasz to complain about the internal affairs investigation into whether the plaintiff was in possession of another officer's uniform. (*Id.* at ¶¶ 33). Hajdasz told the plaintiff that the investigation should be stopped because it was retaliatory. (*Id.* at ¶ 33.) In May 2013, the plaintiff was suspended for one day "in abeyance," given a written reprimand, and required to return his "Field Training Officer Pin." (*Id.* at ¶ 96.)

### 6.  *Bowen and Willauer Bully Cecchini*

A year later around May 2014, Bowen removed the plaintiff's gun from his locker and gave it to another officer "to give back" to the plaintiff. (*Id.* at ¶ 35.) At an unknown time, the plaintiff filed a grievance about his performance evaluation. (*Id.* at ¶ 36.) Willauer said that he would "shove the fucking evaluation down your throat." (*Id.*) Bowen and Willauer repeatedly told the plaintiff that they did not care about his safety on duty. (*Id.* at ¶ 37.) Bowen waived his gun in the plaintiff's face. (*Id.* at ¶ 38.) When Willauer removed the plaintiff from "Street Survival" training, he said that he "didn't care if [the plaintiff] got hurt." (*Id.* at ¶ 37.)

Around May 1, 2014, Bowen said to the plaintiff "would you mind getting the fuck away from my desk?" (*Id.* at ¶ 58.) At some other time, Bowen saw a note about karma that the plaintiff's wife had attached to the plaintiff's coffee cup. (*Id.* at ¶ 59.) Bowen insinuated in front of several officers and the plaintiff that the plaintiff's wife was having an affair with a captain of the Avon police department. (*Id.* at ¶ 59.) Bowen also called him a "fat shit." (*Id.* at ¶ 60.)

> 7. *Cecchini Reports Misconduct and Is Investigated for Providing False Information in an Investigation; Bowen Is Placed on Administrative Leave*

Around May 19, 2014, the plaintiff complained to Willauer, Hajdasz, and Hammick about Bowen and Willauer's comments. (*Id.* at ¶ 57.) On May 20, 2014, the plaintiff sent a memorandum to Hajdasz about Bowen's alleged misconduct during a motor vehicle stop a month earlier. (*Id.* at ¶ 46.) The plaintiff complained that Bowen discarded evidence and falsified a report after the plaintiff found a knife and a straw with white powder on a suspect. (*Id.* at ¶ 47.) He gave the evidence to Bowen, but Bowen did not mention the evidence in his report. (*Id.*) Hajdasz ordered Willauer to investigate the plaintiff's complaint. (*Id.* at ¶ 48.) Based on Willauer's findings, Hajdasz told Hammick that the plaintiff provided false information during the investigation. (*Id.* at ¶ 49.)

On June 5, 2014, Hammick ordered Hajdasz and Willauer to begin an internal affairs investigation of the plaintiff, noting that the plaintiff gave inconsistent statements about whether Bowen called the plaintiff a "fat shit" or a "'piece of shit' needing suspenders." (*Id.* at ¶¶ 51, 53, 61.) Even though there was allegedly no reason to investigate the plaintiff, Hajdasz and Willauer continued to seek to discipline the plaintiff. (*Id.* at ¶¶ 55–56.) While that investigation was pending, Hammick placed Bowen on paid administrative leave after determining that Bowen had committed misconduct. (*Id.* at ¶¶ 54, 62.)

8.    *Cecchini's Wife Complains to the Town Manager;
        Bowen Is Suspended; Cecchini Is Not Disciplined*

On June 12, 2014, the plaintiff's wife, Jackie Cecchini, met with Schenck to complain about the way her husband was being treated and to express her concerns about his safety. (*Id.* at ¶ 40.) She described what Willauer and Bowen had said and done, that her husband was subject to a hostile environment and potential workplace violence, and that the defendants were putting her husband in unnecessary danger. (*Id.* at ¶ 41.) Schenck took no action but told the plaintiff's wife that Bowen was "being monitored," which the plaintiff claims was not true. (*Id.* at ¶¶ 42–43.) Jackie Cecchini contacted Schenck again on July 1, 2014 to repeat her concerns and complain about "corrupt promotional exams." (*Id.* at ¶ 44.) Schenck told her that human resources, not Chief Hammick, decides who receives a promotion and that Bowen was continuing to be monitored. (*Id.* at ¶¶ 44–45.)

On September 6, 2014, Hammick suspended Bowen for two weeks as shown in a "Memorandum of Agreement," but the memorandum stated that the suspension began on August 24, 2014. (*Id.* at ¶¶ 63–64.) Hammick ultimately did not sustain discipline against the plaintiff on September 9, 2014. (*Id.* at ¶ 56.)[1]

9.    *Cecchini's Lawsuit Affects His Candidacy for Union President*

Balloting for the police union's presidential election started around November 14, 2014. (ECF No. 28 at ¶ 137.) Shortly afterwards, the defendants learned that the plaintiff sued them in this lawsuit. (*Id.* at ¶ 132; ECF No. 1.) Fredericks—who was not yet a defendant—used his position as a supervisor while he was on duty to force officers to sign a petition to suspend the election, even though officers are not allowed to conduct union business on the job. (*Id.* at ¶¶

---

[1] The plaintiff wrote "Without any legitimate basis, Hajdasz and Willauer sought discipline against plaintiff pursuant to IA 14-15689, which was after three months and unwarranted delays "Not Sustained" by Hammick on September 9, 2014." (ECF No. 28 at ¶ 56.)

138–39.) On November 19, 2014, the union's attorney told the plaintiff that union members were concerned that the plaintiff might have a conflict of interest as union president because of his lawsuit. (*Id.* at ¶ 141.) That same day, Hammick sent an email about the lawsuit to each Bloomfield police officer, saying that "the defendants intend to vigorously defend the accusations in this matter," encouraging the officers to focus on serving the community, and reminding the officers to report any misconduct to a supervisor. (*Id.* at 148.)

The plaintiff lost his bid to become union president in January 2015 after the election was postponed. (*Id.* at ¶¶ 143–44.) On "numerous" unspecified occasions since the plaintiff brought this suit, the defendants have given him false reprimands and poor performance evaluations. (*Id.* at 147.) All of the defendants' actions were done to ostracize the plaintiff, to imply that he was a liar, and to interfere with the union election in retaliation for the plaintiff's lawsuit. (*Id.* at 149–50.) The plaintiff has suffered humiliation, pain, embarrassment, anxiety, stress, and loss of sleep. (*Id.* at ¶ 100.)

## II.   Discussion

### A.   Legal Standard

In considering a motion to dismiss, I take Cecchini's "factual allegations to be true and [draw] all reasonable inferences in" his favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim for relief. *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007). A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**B.      Count One: Free Speech Retaliation Claim**

Although the plaintiff's allegations are unclear, Count One appears to be brought against the Town of Bloomfield and the other defendants in their individual and official capacities. The defendants move to dismiss Count One as to the all individual defendants in their official capacities and as to Schenck in his individual capacity.

*1.      Official Capacity Claims Against the Individual Defendants*

The defendants argue that Count One should be dismissed against the defendants in their official capacities because they are duplicative of the plaintiff's claims against the Town of Bloomfield. (ECF No. 31-1 at 15.) "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal citations omitted); *see also Reynolds v. Guiliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself."). Cecchini asserts municipal liability claims against Bloomfield for the named individuals' activities in their official capacities; therefore, the official capacity claims against the individual officers are redundant and will be dismissed. *Olschafskie v. Town of Enfield*, No. 3:15-CV-00067 (MPS), 2015 WL 9239742, at *1 (D. Conn. Dec. 17, 2015) (dismissing official capacity claims as duplicative of claims against a municipality); *Demski v. Town of Enfield*, No. 3:14-CV-01568-VAB, 2015 WL 4478401, at *3 (D. Conn. July 22, 2015) ("[D]istrict courts within the Second

Circuit consistently dismiss as duplicative claims asserted against officials in their official capacities where the plaintiff has named the municipal entity as a defendant.").

### 2. The Individual Capacity Claim
### Against Schenck in His Individual Capacity

Schenck moves to dismiss the First Amendment retaliation claim in Count One against him in his individual capacity. To state a claim for First Amendment retaliation, Cecchini must allege that "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). To determine whether his speech is protected a court must consider whether he was speaking "as a citizen on a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), and if so, whether the government—under the so-called *Pickering* analysis—"had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 132 S. Ct. 2369, 2380 (2014)). The parties have not raised the issue of whether the plaintiff's reports of police misconduct were made "as a citizen," *Garcetti*, 547 U.S. at 417, and I express no opinion on that issue.

Schenck's argument centers on whether there are sufficient allegations to make it plausible that Schenck took an adverse action against Cecchini, and whether there was a causal connection between the adverse action and any protected speech. (ECF No. 31-1 at 17–18.)

A supervisor may not be held vicariously liable under § 1983; instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Iqbal*,

556 U.S. at 676). Supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) were grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that a constitutional violation was occurring. *Raspardo*, 770 F.3d at 116 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)).

District Courts in the Second Circuit have struggled with whether the categories for establishing personal liability of supervisory personnel set forth in *Colon v. Coughlin* are still good law:

> In [*Iqbal*], the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in Colon." *Reynolds v. Barrett*, 685 F.3d 193, 205 n. 14 (2012).

*Johnson v. Fischer*, No. 9:12-CV-0210 DNH/TWD, 2015 WL 670429, at *7 n.6 (N.D.N.Y. Feb. 17, 2015) *appeal filed* No. 15-767 (2d Cir. Mar. 11, 2015).

After the Supreme Court's decision in *Iqbal*, the Second Circuit has continued to apply the *Colon* categories to cases brought by police officers against police department supervisors. *Raspardo*, 770 F.3d at 101, 116. Cases that have followed *Raspardo* have not cast doubt on its validity. *E.g.*, *Turkman v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015); *Haynes v. Johnson*, No. 14-3999, 2015 WL 6457738, at *1 n.2 (2d Cir. Oct. 27, 2015). I, therefore, proceed on the

11

assumption that the *Colon* categories continue to provide a viable framework to plead supervisory liability after *Iqbal*.

Here, the plaintiff's allegations specifically involving Schenck include the following facts. At some unspecified point, the plaintiff complained to Schenck about a 2011 incident in which Bowen allegedly conducted an illegal stop and Willauer's subsequent "confront[ation]" about whether plaintiff told the NAACP about Bowen's conduct. (ECF No. 28 at ¶¶ 30–31.) Schenck did nothing in response. (*Id.* at ¶ 34.) After the plaintiff testified in a hearing in February 2013, Schenck along with Hajdasz and Hammick "facilitated" a "conspiracy to harass intimidates and refuses to provide performance evaluation and subsequent refusal to hear grievances. [sic.]" (*Id.* at ¶¶ 76–78.) Schenck ignored the plaintiff's grievances and complaints. (*Id.* at ¶ 92.)

The plaintiff alleges that his wife complained to Schenck, who falsely told her that Bowen was being "monitored." (*Id.* at ¶¶ 42–43.) The plaintiff alleges that Schenck lied when he said that Bowen was being monitored in June and July 2014 but also alleges that Bowen was under investigation from May 2014 until September 2014. (*Id.* at ¶¶ 42–43, 46–49, 63–64.)

Drawing all reasonable inferences in the plaintiff's favor, *Harris*, 572 F.3d at 71, I conclude that the plaintiff has plausibly alleged Schenck's personal involvement under the *Colon* categories. Cecchini alleges that Schenck ignored his grievances and complaints about retaliatory conduct and police misconduct. (ECF No. 28 at ¶ 92.) Specifically, the plaintiff has alleged that Schenck did nothing after Cecchini reported retaliation for his report of misconduct. (*Id.* at ¶¶ 30–31, 34.) At this early pleading stage, it is reasonable to infer that Schenck as town manager (*id.* at ¶ 7), had the authority to prevent retaliation from occurring but did not do so. Therefore, the plaintiff has plausibly alleged that Schenck failed to remedy a violation after learning of it

through a report, which is sufficient to state a claim against him as a supervisor. *See Raspardo*, 770 F.3d at 116 ("The personal involvement of a supervisory defendant may be shown by evidence that . . . the defendant, after being informed of the violation through a report or appeal failed to remedy the wrong." (quoting *Colon*, 58 F.3d at 873)).

Therefore, the motion to dismiss as to the claim in Count One against Schenck in his individual capacity is denied. The case will thus proceed on Count One against the Town of Bloomfield and the individual capacity claims against Schenck, Hammick, Hajdasz, Willauer, Bowen, and Fredericks.[2]

### C.     Count Two: Intentional Infliction of Emotional Distress

#### 1.     Intentional Infliction of Emotional Distress as to the Town of Bloomfield

The plaintiff claims that the defendants have intentionally inflicted emotional distress. The Town of Bloomfield argues that the claim against it should be dismissed because a municipality is immune from liability for its employees' intentional torts under Conn. Gen. Stat. § 52-557n. The plaintiff states that he has not brought a claim of intentional infliction of emotional distress against the Town of Bloomfield (ECF No. 32 at 17.) However, the Complaint states that Count Two is brought against all of the defendants. (ECF No. 28 at ¶ 106.) Therefore, I construe the plaintiff's statement to be a motion to withdraw his claim in Count Two against the Town of Bloomfield and grant the motion. *See Aviles v. Wayside Auto Body, Inc.*, 49 F. Supp. 3d 216, 234 (D. Conn. 2014) (treating a plaintiff who "dropped" a claim in his objection to a motion for summary judgment as making a motion to withdraw a claim).

---

[2] Although Fredericks does not appear to be mentioned before Count Six, the defendants have not moved to dismiss this count against him.

2.      *The Plaintiff Has Stated a Claim for Intentional*
*Infliction of Emotional Distress Against Bowen*

The plaintiff brings a claim of intentional infliction of emotional distress against all of the individual defendants. (ECF No. 32 at 18.) The plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000). The defendant's conduct must be "beyond all possible bounds of decency, . . . atrocious, and utterly intolerable . . . ." *Id.* at 210–11. Merely insulting or rude actions are insufficient to plead a claim for intentional infliction of emotional distress. *Id.* at 211.

Here, the plaintiff alleges that the "individual defendants intended to subject plaintiff to public ridicule, falsely stating he was an inferior officer, a thief and filing [an] untrue lawsuit, made statements that they did not care if he was shot on duty or otherwise severely harmed and subjected to public scorn by the defendants." (ECF No. 28 at ¶ 108.) The plaintiff's complaints against the defendants about untimely and inaccurate performance evaluations, denial of promotions, and unprocessed grievances are not examples of extreme and outrageous conduct. *Bombalacki v. Pastore*, 71 Conn. App. 835, 840–41 (2002) (Police chief's conduct was not extreme and outrageous when he spoke ill of a police officer, opposed an officer's promotion, and did not recommend the officer for promotion).

Likewise, the claim against Hajdasz does not state a claim for intentional infliction of emotional distress. The plaintiff alleges that Hajdasz "improperly ordered Willauer to conduct an investigation into the plaintiff's complaint against Bowen . . . ." (ECF No. ¶ 48.) Consequently, Hajdasz sought to discipline the plaintiff and "without any support adopted and supported the

14

false determinations of Willauer" that the plaintiff had provided false information in an internal investigation. (*Id.* at ¶¶ 49–51.) The actions of a supervisor who falsely states than an employee has lied, without more, are not extreme and outrageous. *Petyan v. Ellis*, 200 Conn. 243, 245, 254 (1986) *superseded by statute on other grounds as stated in Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 786–88 (2005). It is not "beyond all possible bounds of decency" for a police captain to investigate an officer's role in a complaint of police misconduct, to adopt the report of the investigating officer, and to seek to discipline an officer who is suspected of lying. *Appleton*, 254 Conn. at 210–11. Thus, the only two defendants against whom the plaintiff might have a claim for intentional infliction of emotional distress are Bowen and Willauer.

There are allegations that Bowen told the plaintiff that his wife was sleeping with a police captain, that Bowen waived a gun in the plaintiff's face, and that Bowen told the plaintiff that he did not care about his safety on duty. (*Id.* at ¶¶ 37–39, 59.) Bearing in mind that I must draw all reasonable inferences in favor of the plaintiff, *Harris*, 572 F.3d at 71, Bowen's alleged actions of angrily waiving a gun in the plaintiff's face, stating that he did not care if the plaintiff was safe on duty, and telling the plaintiff at "roll call attended by numerous employees" that his wife was having an affair with a police captain could amount to extreme or outrageous conduct; his actions are not merely insulting or impolite but are, at least as construed at the pleadings stage, beyond all possible bounds of decency in this context. *Appleton*, 254 Conn. at 210–11; *cf. Russo v. City of Hartford*, 341 F. Supp. 2d 85, 120 (D. Conn. 2004) ("mere verbal threat" outside the presence of the plaintiff that "was not repeated or acted upon" is not as a matter of law extreme and outrageous.")

The allegations against Willauer do not state a claim because they are merely rude and insulting and do not extend "beyond all possible bounds of decency." *Appleton*, 254 Conn. at

210–11. Willauer expressed "concern that the plaintiff had notified the NAACP" about police misconduct. (ECF No. 28 at ¶ 30.) Willauer cursed at the plaintiff and told him to shove an evaluation down his throat. (*Id.* at ¶ 36.) He told the plaintiff that he didn't care about his safety—but unlike Bowen did not angrily waive a gun in the plaintiff's face. (*Id.* at ¶ 37.) Willauer also questioned the plaintiff "excessively and without notice or union representation" and sought to discipline the plaintiff after being ordered to begin an internal affairs investigation into the plaintiff. (*Id.* at ¶¶ 48, 55–56, 61, 82.) He made the "false finding" that the plaintiff lied in an investigation. (*Id.* at ¶ 49.) Given that Willauer did not physically threaten the plaintiff with a gun while also expressing disregard for the plaintiff's safety or publically insinuate that the plaintiff's wife was having an affair—unlike Bowen—Willauer's conduct does not rise above merely insulting or impolite behavior; the case against Willauer is not "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Appleton*, 254 Conn. at 211 (citations omitted). Therefore, Count Two is dismissed except for the plaintiff's claim against Bowen.

### D.   Count Three: Section 1983 Claim Against the Town of Bloomfield

In Count Three, the plaintiff alleges that the Town of Bloomfield violated his rights to free speech and association under the First Amendment and his right to equal protection under the Fourteenth Amendment. (ECF No. 28 at ¶¶ 112–23.) The defendants move to dismiss the equal protection claim in Count Three. (ECF No. 31-1 at 25.) However, the plaintiff states in his opposition that he is not bringing an equal protection claim against the Town in Count Three. (ECF No. 32 at 18 ("The plaintiff's equal protection claim is not against the defendant Town.") Construing the plaintiff's statement as a motion to withdraw his Fourteenth Amendment claim in Count Three against the Town of Bloomfield, I grant the motion. *See Aviles*, 49 F. Supp. 3d at

234 (D. Conn. 2014) (treating a plaintiff who "dropped" a claim in his objection to a motion for summary judgment as making a motion to withdraw a claim).

Even if the plaintiff did not intend to withdraw his equal protection claim in Count Three, the claim does not statue a plausible violation of the Fourteenth Amendment. That amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A government employer does "not escape the strictures of the Equal Protection Clause in their roles as employers," but not "every employment decision [is] a constitutional matter." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 597 (2008) (internal quotations and citations omitted). So-called "class-of-one" claims, where a person claims to have been singled out for unequal treatment, are not permitted in the public employee context. *Id.* at 605.

Rather, "the Equal Protection Clause is implicated when the government makes class-based decisions in the [public] employment context, treating distinct groups of individuals categorically differently." *Id.* The plaintiff emphasizes that he is not bringing a class-of-one claim. (ECF No. 32 at 22.) Thus, as a public employee, Cecchini must allege that he was part of a distinct group of individuals, which the Town of Bloomfield treated categorically differently. *Engquist*, 553 U.S. at 605.

The plaintiff alleges that Bloomfield's policies were used "to retaliate against Plaintiff, and other similarly situated officers, who speak on a matter of public concern, or associate or and [sic.] advocate for their union." (*Id.* at 118–19.) One could argue—although the plaintiff does not appear to do so—that the plaintiff alleges here that he is part of the class of unionized officers who exercise their free speech rights. (ECF No. 32 at 22–23.) Even if the plaintiff does make that argument, he does not allege facts to support the conclusory allegation that this class exists and

17

that it was treated differently. The plaintiff does allege facts about a disciplinary hearing of Donald Rajtar, a fellow union member, but Rajtar was disciplined for working unauthorized overtime, not for exercising his free speech rights. (ECF No. 28 at ¶¶ 67–71.) The plaintiff merely states that he is a member of a class but does not allege that other class members exist or that the Town of Bloomfield "treat[ed this] distinct group[] of individuals categorically differently." *Engquist*, 553 U.S. at 606.

The plaintiff attempts to bring an equal protection claim based on the theory of selective enforcement. The Second "Circuit has not yet decided whether selective enforcement claims are still viable in the public employment context after" the Supreme Court eliminated public employee class-of-one claims in *Enquist*. *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011); *Kamholtz v. Yates Cnty.*, 350 F. App'x 589, 591 (2d Cir. 2009). "[E]ven assuming that [the plaintiff], a public employee, is not [barred] from pursuing a selective enforcement claim, he nevertheless has failed to sufficiently state his claim." *Kamholtz*, 350 F. App'x at 591 (internal citation omitted).

"To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (quoting *LaTrieste Rest. & Cabaret v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)). The defendants argue that the plaintiff has not identified similarly situated individuals in his allegations. (ECF No. 31-1 at 26.) In response, the plaintiff does not point to any allegations in the Second Amended Complaint to address this

concern. Rather, he contends that he does not have to *identify* a similarly situated individual until summary judgment. (ECF No. 32 at 18–19.) A plaintiff must, at the very least, allege that he was treated differently than a similarly situated individual. *Kamholtz*, 350 F. App'x at 591 ("For a claim of selective enforcement, plaintiff must allege: 1. That compared with others similarly situated, he was selectively treated . . . .").

Although not pointed out by the plaintiff, the closest he comes to stating that he was treated differently than similarly situated individuals is this statement: "Defendants have orchestrated a joint effort to force plaintiff from his government employment, similarly situated persons were not denied promotion; thereby his Equal Protection and Property Rights in government employment were violated." (ECF No. 28 at ¶ 120.) But this is conclusory and the factual allegations do not bear out that conclusion. In 2012, the plaintiff took a test to become a sergeant but he was not promoted because his score was changed; he does not allege that anybody else was promoted at that time. (*Id.* at ¶ 84.) In 2013, he was one of two applicants for a detective position; he was not promoted but he does not suggest that the other applicant received a promotion. (*Id.* at ¶¶ 86–87.) Finally, in 2014, the plaintiff and one other officer applied to become a sergeant; the plaintiff was unsuccessful but there is no allegation that the other officer advanced to sergeancy. (*Id.* at ¶¶ 88–89.) Therefore, the plaintiff's equal protection claim fails because he has not alleged that he was treated differently than a similarly situated individual.

In the defendants' motion to dismiss and their memorandum in support of their motion, they explicitly limit their motion to arguing that the plaintiff had not stated an equal protection claim. (ECF No. 31-1 at 25 ("At this time, Defendants address only Plaintiff's Equal Protection claim, which should be dismissed as a matter of law, as Plaintiff has failed to set forth a cause of action."); ECF No. 31 at 2 ("Count Three should be dismissed as to the Town because Plaintiff

has failed to assert a claim for a violation of the Equal Protection Clause.").) The defendants'

reply brief raises novel attacks that relate to the First Amendment and municipal liability. (ECF

No. 33 at 1.) I decline to address these arguments because the defendants raised them for the first

time in their reply brief. *Ringenback v. Crabtree Cadillac-Oldsmobile, Inc.*, 99 F. Supp. 2d 199,

204 (D. Conn. 2000).

For the reasons discussed above, the only remaining claim in Count Three is against the

Town of Bloomfield for violations of the First Amendment. [3]

### E.   Count Four: Liability Under Conn. Gen. Stat. § 52-557n Against the Town of Bloomfield

Unless otherwise provided by law, a municipality is liable for the negligent acts of its

employees. Conn. Gen. Stat. § 52-557n(a)(1)(A). The issue is whether Bloomfield can be held

liable under a statute that makes municipalities liable for the negligence of its employees when

the plaintiff does allege that a municipal employee was negligent. It cannot. I grant the motion to

dismiss as to Count Four because the plaintiff invokes Bloomfield's liability under Conn. Gen.

Stat. § 52-557n on a negligence theory but has eliminated his claim for negligent infliction of

emotional distress, which was his only claim sounding in negligence. Conn. Gen. Stat. § 52-

557n(a)(1)(A); (ECF No. 32 at 2; ECF No. 28 at ¶ 126; ECF No. 18 at ¶¶ 71–74).

### F.   Count Five: Aiding and Abetting Against All Defendants

The defendants move to dismiss Count Five, which the plaintiff brings against all of the

defendants for the common law tort of aiding and abetting. The elements for aiding and abetting

are:

> (1) [T]he party whom the defendant aids must perform a wrongful act that causes
> an injury; (2) the defendant must be generally aware of his role as part of an

---

[3] It is unclear whether this claim is intended to be distinct from the First Amendment claim
against the Town in Count One. The defendants, however, have not raised this point.

overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Williams v. Cmty. Sols., Inc.*, 932 F. Supp. 2d 323, 333 (D. Conn. 2013) (quoting *Efthimiou v. Smith*, 268 Conn. 499, 505 (2004)). The defendants argue that the plaintiff has merely recited the elements of aiding and abetting. (ECF No. 31-1 at 27–28.) The plaintiff responds by reciting the elements of aiding and abetting. (ECF No. 32 at 26.) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to state a claim for relief. *Iqbal*, 556 U.S. at 678. Here, the plaintiff recites the elements of aiding and abetting but alleges no facts to support his conclusory allegations, other than a passing reference to the entire Second Amended Complaint. (ECF No. 28 at ¶¶ 127–30.) Count Five is, therefore, dismissed.

### G.   Count Six: First Amendment Retaliation

Count Six is brought against all of the defendants and concerns a First Amendment retaliation claim arising out of events that occurred after the plaintiff filed this lawsuit. (ECF No. 28 at ¶ 133.) When filing a lawsuit is the basis for a First Amendment claim, it is properly analyzed under the Petition Clause, not the Speech Clause. U.S. Const. amend. I; s*ee also Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011). However, "[t]he framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right." *Guarnieri*, 131 S. Ct. at 2500. Courts use the same test for claims under the Petition Clause as they use for claims under the Speech Clause in the context of public employee suits. *Singer v. Ferro*, 711 F.3d 334, 342 (2d Cir. 2013).

To state a claim for First Amendment retaliation, Cecchini must allege that "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the

protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). To determine whether his speech is protected, I must consider whether he was speaking "as a citizen on a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), and if so, whether the government—under the so-called *Pickering* analysis—"had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer," *Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 132 S. Ct. 2369, 2380 (2014)).

*1.     Whether Cecchini's Lawsuit Addresses a Matter of Public Concern*

The defendants argue that the plaintiff's lawsuit is not protected by the First Amendment because his lawsuit is not on a matter of public concern. The issue is whether a complaint, which alleges among other things that a police officer reported police misconduct that he witnessed while on duty, testified in a disciplinary hearing about internal police department policies, was subsequently denied promotions and timely evaluations, was subjected to internal investigations, and was otherwise treated poorly by his coworkers "addresses a matter of public concern or is merely 'related to personal grievances.'" *Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014) (quoting *Reuland v. Hynes*, 460 F.3d 409, 417 (2d Cir. 2006)) A lawsuit is not a matter of public concern merely because it raises a First Amendment claim. *Singer*, 711 F.3d at 342–43. Generally, a matter of public concern "relates to any matter of political, social, or other concern to the community" as "determined by the content, form, and context of a given statement, as revealed by the whole record," including the speaker's motive, though motive is not dispositive. *Golodner*, 770 F.3d at 203, 202.

A public-employee's lawsuit must do more than present a "generalized public interest in the fair or proper treatment of public employees." *Ruotolo v. City of New York*, 514 F.3d 184,

190 (2d Cir. 2008). The "First Amendment does not protect all private ventings of disgruntled public employees," and accusations of public corruption receive First Amendment protection only when the corruption "constitutes 'a subject of general interest . . . to the public.'" *Singer*, 711 F.3d at 340 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)).

In *Golodner v. Berliner*, a government contractor, who was considered a public employee, sued his employer for constitutional violations arising out of his arrest that was allegedly motivated by a "constitutionally impermissible policy promulgated by the City and malice directed at him personally," and by "malicious intent to retaliate against [him] for having complained against a brother officer." *Golodner*, 770 F.3d at 199, 204–05. The court held that the contractor's lawsuit rose to the level of public concern because it was an "attempt to vindicate [the public employee's] constitutional rights under the Fourth and Fourteenth Amendments in the face of alleged police misconduct directed against him as a private citizen." *Id.* at 204. The court said that the public employee's theory that the defendants maliciously intended to retaliate against him in his "complaint incontrovertibly implicate[s] police misconduct that raises serious constitutional concerns, and [is], therefore, clearly [a] matter[] of public concern." *Id.* at 205.

The plaintiff's lawsuit is on a matter of public concern. "Exposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2011)). Here, the plaintiff alleges that the Town of Bloomfield and its employees retaliated against him after he reported racial profiling. (*See, e.g.*, ECF No. 28 at ¶¶ 20–32.) The plaintiff's lawsuit is about the harm that the defendants inflicted on the plaintiff after he reported

official misconduct within a police department. His lawsuit, therefore, addresses a matter of public concern. *Golodner*, 770 F.3d at 204–05.

> 2.  *Cecchini's Retaliation Claim in Count Six Against Fredericks*

The defendants ask me to dismiss the claim in Count Six against Fredericks because they argue that he was not acting under color of law. (ECF No. 31-1 at 32.) "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 49–50 (internal citations and quotations omitted).

In analyzing whether a police officer is acting under color of law, "[m]ore is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred. For example, liability may be found where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department. Liability also may exist where off-duty police officers perform duties prescribed generally for police officers. In short, courts look to the nature of the officer's act, not simply his duty status." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994) (internal citations omitted). "Although no 'bright line' separates actions taken under color of law from personal pursuits, the 'relevant question' in determining whether an action was taken under color of law is not whether the action was part of the defendant's official duties but, rather, whether the action was made possible only because the wrongdoer is clothed with the authority of [state] law." *United States v. Temple*, 447 F.3d 130, 138 (2d Cir. 2006) (internal citations and quotations omitted).

Here, the plaintiff alleged that Fredericks, an on-duty police lieutenant, used his authority as a supervisor and a lieutenant to force on-duty police officers to sign a petition against the plaintiff. (ECF No. 28 at ¶¶ 138–140.) Even though his petition related to union activity, Fredericks allegedly exercised power possessed solely by virtue of state law by using his rank as lieutenant to force on-duty officers to sign a petition. *West*, 487 U.S. at 49. This is further supported by the allegation that officers were not permitted to conduct union business while working, but Fredericks compelled officers to violate this policy. (ECF No. 28 at ¶¶ 139–40.) It is reasonable to infer that his role as a lieutenant helped him to coerce his junior officers into breaking the policy against on-duty union activity by signing the petition against Cecchini. Drawing all reasonable inferences in the plaintiff's favor *Harris*, 572 F.3d at 71, I conclude that the plaintiff has plausibly alleged that Fredericks was able to require the on-duty officers to sign a petition "only because [Fredericks was] clothed with the authority of [state] law," *Temple*, 447 F.3d at 138. The plaintiff adequately alleges that Fredericks was acting under color of law.

### 3.    Cecchini's Retaliation Claim in Count Six Against Schenck

The defendants have moved to dismiss the claim against Schenck in Count Six because the plaintiff has not alleged that Schenck was involved in retaliatory misconduct following the filing of this lawsuit. (ECF No. 31-1 at 35.) Count Six mentions Hammick, Hajdasz, Willauer, Bowen, and Fredericks, but not Schenck. (ECF No. 28 at ¶¶ 131–150.) At times the plaintiff states generically that "the defendants" took actions against him, but unlike the other defendants, does not otherwise refer to Schenck. Therefore, I grant the motion to dismiss Count Six as to Schenck and, for the reasons discussed above, deny the motion as to the remaining defendants.

### H.    Common Law Attorney's Fees

The defendants move to dismiss the plaintiff's request for common law attorney's fees on the ground that Connecticut follows the so-called American rule that parties generally pay their

own attorney's fees and costs. There is an exception to this rule where a party or his attorney acts in bad faith during the course of litigation. *Maris v. McGrath*, 269 Conn. 834, 835, 844 (2004). Therefore, dismissing the plaintiff's claim for common law attorney's fees is premature at this early stage of litigation, although I have no reason to expect that the parties or attorneys will act in bad faith.

## III.   Conclusion

For the reasons discussed above, the Motion to Dismiss (ECF No. 31) is GRANTED in part and DENIED in part. Count One is dismissed against the individual defendants in their official capacities. Count Two is dismissed as to all of the defendants except for Richard Bowen. I do not dismiss Count Three because the defendants moved to dismiss only the equal protection claim in that count, which the plaintiff subsequently has withdrawn. Counts Four and Five are dismissed in their entirety. Finally, I grant the motion to dismiss Count Six as to Phillip Schenck and deny the motion as to the remaining defendants.

The following counts remain: the claim in Count One against the Town of Bloomfield and the individual defendants in their individual capacities, the claim in Count Two against Bowen, the claim in Count Three against the Town of Bloomfield under the First Amendment, and the First Amendment Claim in Count Six against the Town of Bloomfield, Hammick, Hajdasz, Willauer, Fredericks, and Bowen.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                February 29, 2016