# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SEAN CECCHINI,
     Plaintiff,

     v.

PHILLIP K. SCHENCK, JR., PAUL B. HAMMICK,
STEPHEN HAJDASZ, MATTHEW WILLAUER,
RICHARD BOWEN, TOWN OF BLOOMFIELD,
and ARTHUR FREDERICKS,
     Defendants.

No. 3:14-cv-1704 (MPS)

## RULING AND ORDER

Plaintiff Sean Cecchini is a police officer for the Town of Bloomfield, Connecticut. He brings this case against the Town of Bloomfield, Town Manager Phillip K. Schenck, Jr., Chief of Police Paul B. Hammick, and four employees of the Bloomfield police department: Sergeant Richard Bowen, Lieutenant Arthur Fredericks, Captain Stephen Hajdasz, and Lieutenant Matthew Willauer. According to Cecchini, the defendants retaliated against him in violation of the First Amendment to the U.S. Constitution[1] after he (1) reported Bowen for racial profiling during a motor vehicle stop, (2) testified in support of a different officer in a union disciplinary hearing, and (3) filed this lawsuit. He also claims that Bowen intentionally inflicted emotional distress by pointing a gun at him. Defendants seek summary judgment on all claims. (ECF No. 52.) As set forth below, based on the evidence the parties have presented, the motion for summary judgment is GRANTED in part and DENIED in part.  The case may proceed only as to certain First Amendment claims against Hammick and Willauer.

---

[1] Cecchini's complaint also included a free speech claim under the Connecticut Constitution, but he has abandoned that claim by not addressing it in his opposition to summary judgment. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009).

# I.   Background

## A.  Procedural History

Cecchini filed this lawsuit under 42 U.S.C. § 1983 on November 17, 2014. (ECF No. 1.) He then amended his complaint twice, on January 8, 2015 and March 3, 2015. (ECF Nos. 18; 28.) On February 29, 2016, I granted in part and denied in part Defendants' motion to dismiss the second amended complaint. (ECF No. 43.) I dismissed claims against the individual defendants in their official capacities, claims of state law negligence and aiding and abetting, the intentional infliction of emotional distress claim against all defendants but Bowen, and the post-lawsuit retaliation claim against Schenck. (*Id.*)  On May 20, 2016, Defendants filed this motion for summary judgment. (ECF No. 52.)

## B.  Facts

The following facts are taken from the parties' Local Rule 56(a) Statements and the documents cited therein. *See* Defendants' Local Rule 56(a)(1) Statement, ECF No. 50-2 ("Def.'s LRS"); Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 55-2 ("Pl.'s LRS"); Defendants' Reply to Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 58-1 (Def.'s LRS Reply"). Facts are undisputed unless otherwise stated.

### 1.   The Parties

The plaintiff, Sean Cecchini, has worked as a police officer for Defendant, the Town of Bloomfield, since 1996. (Def.'s LRS ¶ 1; Pl.'s LRS ¶ 1.) Defendant Phillip K. Schenck, Jr. is Bloomfield's Town Manager, a position he has held since 2013. (*Id.* ¶¶ 89, 431.) Defendant Paul B. Hammick has been the Bloomfield Police Chief since January 3, 2011. (*Id.* ¶ 123; ECF No. 52-4 at 149.) Defendant Stephen Hajdasz has worked as a Bloomfield Police Captain since May 29, 2012.  (Def.'s LRS ¶ 230; Pl.'s LRS ¶ 230.) Defendant Matthew Willauer is a Lieutenant in the

Bloomfield Police Department, and supervised the patrol division from 2014-2015. (*Id.* ¶ 209.) Defendant Arthur Fredericks is also a Lieutenant in the Bloomfield Police Department, who in December 2013 was the supervisor of Officer Cecchini's direct supervisor, Sergeant Jose Martinez (not a Defendant). (*Id.* ¶¶ 297-98.) Defendant Richard Bowen was a Bloomfield police officer until March 30, 2012, when he was promoted to Sergeant, and then worked as a Sergeant until his retirement on February 15, 2016. (*Id.* ¶ 403; ECF No. 52-4 at 145.)

### 2.  *Early Conflicts with Bowen and Willauer (Pre-August 2011)*

Cecchini and Bowen used to be friends, but had a falling out prior to August 25, 2011, while both were Bloomfield police officers and union representatives. (Def.'s LRS ¶¶ 9-11; Pl.'s LRS ¶¶ 9-11.) Among their conflicts, Bowen complained to his supervisors that Cecchini had interfered with his radio calls, and Cecchini expressed concerns about Bowen's conduct during motor vehicle searches. (*Id.* ¶¶ 14, 19-22.) At some point in 2011 (prior to August), Bowen pointed his gun at Cecchini in the Bloomfield Police Department parking lot. (*Id.* ¶ 24.)

Cecchini and Willauer also had interpersonal conflicts from 2005-2010, when Cecchini served as the president of the Bloomfield police union and Willauer was a Lieutenant. (*Id.* ¶¶ 183-86.) During that time period, Willauer sent emails and made comments that Cecchini felt were condescending and undermined his union advocacy efforts. (*Id.*)

### 3.  *Bowen's August 2011 Motor Vehicle Stop and Cecchini's Reporting*

On August 25, 2011, Cecchini acted as back-up for Bowen (then an officer) on a motor vehicle stop of three African American men. (Pl.'s LRS ¶ II.2; Def.'s LRS Reply ¶ II.2.) What took place during that stop is disputed. According to Cecchini, Bowen illegally stopped and searched the three men. Bowen falsely stated that he smelled marijuana, ordered the three men out the car, and asked if they had marijuana. (Pl.'s LRS ¶¶ II.2-3.) When the men said no, Bowen told

3

them that a police dog was on its way and would bite them if they had marijuana. (*Id.* ¶ II.3.) Cecchini told the men that the dog would not bite them. (*Id.*) Bowen then patted down one of the men, who was wearing gym shorts, and grabbed his penis. (*Id.* ¶ II.4.) When the man said "hey that's my dick," Bowen responded, "you're not that big anyway," and the other officer on the scene laughed. (*Id.* ¶ II.5.) The parties agree that no narcotics were found. (Def.'s LRS ¶ 31; Pl.'s LRS ¶ 31.)

Later that same day, August 25, 2011, Cecchini complained to a Sergeant named Shawn Bolden about the stop. (*Id.* ¶ 28.) Bolden told Cecchini to draft a report detailing the complaint, which Cecchini did. (*Id.* ¶ 29; ECF No. 52-4 at 165-66.) At that time, the Town of Bloomfield required police department employees to report other employees' misconduct through the chain-of-command as soon as practicable, including improper arrest, improper search, differential treatment, and harassment. (Def.'s LRS ¶¶ 38-42; Pl.'s LRS ¶¶ 38-42.)

Some time in the following weeks, two individuals at the Bloomfield Police Department followed up on Cecchini's report. First, Bolden spoke with Bowen. (*Id.* ¶¶ 33-34.) Then, on September 16, 2011, a Lieutenant named Alvin Schwapp met with Bowen to discuss his concerns related to the stop. (*Id.*) Bowen told Schwapp that he understood and accepted responsibility. (*Id.* ¶ 34.) The Bloomfield Police Department did not take further action to investigate the complaint or discipline Bowen. (*Id.* ¶¶ 35-37.) Cecchini maintains, and Defendants dispute, that Bolden's and Schwapp's actions did not amount to an investigation, at a minimum because they did not interview any witnesses to the alleged misconduct. (Pl.'s LRS ¶ 37.)

After filing the report, Cecchini spoke with other officers in the Bloomfield Police Department about Bowen's misconduct. (Pl.'s LRS ¶ II.8; Def.'s LRS Reply ¶ II.8; ECF No. 52-4 at 24-25.) Cecchini stated at his deposition that he does not know whether Bowen was aware of

4

these conversations. (ECF No. 52-4 at 24-25.) However, he claims that "everybody" in the police department was aware of the complaint he had made against Bowen, and that the complaint "was left on Sergeant Bolden's desk for everybody to view for over a week." (ECF No. 55-6 at 10.)

Cecchini further claims, and Defendants dispute, that he spoke with individuals outside of the police department about Bowen's misconduct and what "he felt was a policy of racial profiling." (Pl.'s LRS ¶¶ 53-54; ECF No. 55-5 ¶¶ 16-17.) Specifically, Cecchini states that he,

> reported it to Retired Bloomfield Officers Danny Rosenthal, Mark Darren, Robert Lostimolo, Robert Black, Ray Kitchens, Richie Lyons, Blue Hills Fire Chief Farmer, Fire Chief Riley, Bloomfield Captain Rilet, Lt, Riley, fireman Goldstien. Lt. Davis, Channel 3 reporter, Len Bestoff, CT state Police Rick Conneyor, Hartford Police Officer Pat Farrell, Elks club member Robert Coffee, South Windsor Police Chris Duchesne, my neighbors Sandy Dorosure and Tony Leone who is CT probation officer, Fran Politis, Bloomfield Garage, Kurt Neligon, Bloomfield Car Care….

(*sic*) (ECF No. 55-5 ¶ 16.)[2]  Cecchini does not give dates for any of these conversations, and does not state whether or not he believes any of the Defendants were aware of them.

### 4. Further Conflicts with Bowen (Fall 2011 - Early 2013)

According to Cecchini, about 30 days after the August 25, 2011 complaint, Bowen (still an officer) yelled "what kind of cop rats on another cop" and pointed his gun at Cecchini. (Def.'s

---

[2] In his affidavit, Cecchini also states that he spoke with the NAACP about Bowen's misconduct. However, the "sham issue of fact" doctrine "prohibits a *party* from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (emphasis in original). In his prior deposition testimony, Cecchini stated that he did not speak to the NAACP about the Bloomfield Police Department.  (ECF No. 58-2 at 5-7.) He cannot contradict that sworn testimony now.

Defendants argue that the "sham issue of fact" doctrine also prohibits Cecchini from relying on statements in his affidavit that he spoke with other individuals outside the police department. I disagree: while it may be true that Cecchini made these claims for the first time in his affidavit, Defendants have not cited any specific portion of deposition testimony that directly contradicts them.

LRS ¶¶ 61-63; Pl.'s LRS ¶¶ 61-63.)[3]  Defendants dispute the details of this incident. (*Id.*) Then, following Bowen's promotion to Sergeant on March 30, 2012, Cecchini claims (and Defendants again dispute) that Bowen took a number of additional actions targeting him. Cecchini claims that Bowen insulted him, took his bus duty away, denied his requests to work out during his shift, and excessively scrutinized his patrol activities. (*Id.* ¶¶ 65-75.) Cecchini also claims that Bowen removed a gun from his locker and gave it to another officer to return to him, stating "I found your gun and that was a free bee next time will be a problem." (*Id.* ¶¶ 55-59.) The precise timing of these incidents is unclear.

### 5.  *Cecchini's Union Testimony (February 2013)*

In February 2013, a Bloomfield police officer named Donald Rajtar faced disciplinary proceedings for working overtime without obtaining supervisor permission. (*Id.* ¶ 187.) Cecchini participated in Rajtar's disciplinary hearing, testifying about the overtime policy and presenting a petition signed by union members as an exhibit. (Pl.'s LRS ¶¶ II.16, 19; Def.'s LRS Reply ¶¶ II.16, 19.) Cecchini claims, and Defendants dispute, that Willauer and Hammick made angry comments to him surrounding this hearing. According to Cecchini, prior to the hearing, Willauer said, "Are you ready for me?" and "Are you just going to throw shit on the wall?" (*Id.* ¶ 189.) Cecchini also claims that Hammick initially denied him entry to the hearing, required him to produce a subpoena in order to attend, and angrily stated "I don't like being jackpotted" after the testimony had concluded. (*Id.*  ¶¶ 190, II.17.)

---

[3] In his affidavit, Cecchini states that this incident took place sometime after Thanksgiving 2011. (ECF No. 55-5 ¶ 9.) However, this statement is directly contradicted by Cecchini's deposition testimony that the incident was "within" a "30-day span" of when "[t]he complaint was made," *i.e.* August 25, 2011. (ECF No. 52-4 at 19.) Therefore I must disregard the affidavit statement under the "sham issue of fact" doctrine. *See* note 2, *supra.*

### 6.  Two Disciplinary Incidents (May and July 2013)

On May 1, 2013, Chief Hammick disciplined Cecchini for "failing to respond to a dispatched medical call as soon as practicable without undue delay." (Def.'s LRS ¶¶ 108-10; Pl.'s LRS ¶¶ 108-10; ECF No. 52-5 at 72.) Cecchini had been dispatched to help a seventy-year old suffering from chest pains and low blood pressure, but was delayed because he went back inside the restaurant where he had been having lunch. (Def.'s LRS ¶¶ 103-05; Pl.'s LRS ¶¶ 103-05.) Cecchini received a written reprimand and assignment to develop and perform a training session within 60 days. (*Id.* ¶ 109, ECF No. 52-5 at 72.)  He waived his right to a hearing and agreed to take the discipline as he felt he was at fault. (Def.'s LRS ¶ 110; Pl.'s LRS ¶ 110.)

On July 25, 2013, Hammick disciplined Cecchini a second time (in response to a report by Willauer) for performing his duties in a "careless or negligent manner." (Def.'s LRS ¶ 118; Pl.'s LRS ¶ 118; ECF Nos. 52-5 at 73-87.) Cecchini had received information about a possible threat to students at a high school, but did not make a case incident report, immediately notify a supervisor, or investigate the case. (Def.'s LRS ¶¶ 111-12, 115; Pl.'s LRS ¶¶ 111-12, 115.) Cecchini received a written reprimand and one day of suspension. (*Id.* ¶ 118.) He stated that he took responsibility for the incident and waived his right to a hearing. (*Id.* ¶¶ 117, 119.)

Some time after that, Hammick told Cecchini that he wanted him to give up his field training responsibilities. (*Id.* ¶ 121.) Defendants claim that this was due to the two disciplinary incidents. (*Id.* ¶ 122.) Cecchini claims that it was not due to discipline and that Hajdasz "repeatedly harassed [him] for days" to give up the pin. (ECF No. 55-5 ¶¶ 40-41.)  Cecchini also claims that four other individuals retained their field training responsibilities despite engaging in worse or equal conduct. (Def.'s LRS ¶¶ 126-34; Pl.'s LRS ¶¶ 126-34.) Some of those individuals also lost

field training responsibility for a period, but had it restored after performance improved. (*Id.* ¶¶ 136-37.)

### 7. *Further Conflicts with Willauer (July 2013 and Unknown Times)*

On July 3, 2013, Willauer e-mailed Cecchini to request information about his allegations of racial profiling against Bowen. (Def.'s LRS ¶ 210; Pl.'s LRS ¶ 210; ECF Nos. 55-15; 55-16; 55-17; 55-18; 55-19; 55-20.) Cecchini directed Willauer to his August 25, 2011 report, and Willauer responded, "The information brought to my attention alleges that you have accused Sgt. Bowen of engaging in racial profiling and that you have discussed reporting his behavior to the NAACP." (Def.'s LRS ¶ 216; Pl.'s LRS ¶ 216; ECF No. 55-17.) On July 7, 2013, Cecchini wrote:

> Reporting any complaint to the NAACP was discussed with Off. Aliano. My fear was and is that I would be the subject of backlash for making the original complaint. I've framed the searches as being the issue. Sorry this wasn't included in my original response. I have not contacted the NAACP or any other organization regarding the complaint. It has been frustrating because there was no closure.

(ECF No. 55-19.) Willauer responded on July 11, 2013, writing that there was no evidence to support Cecchini's allegations of racial profiling, reminding him of his responsibility to report misconduct, and stating, "I remind you that reckless accusations of misconduct on the part of another employee can also result in discipline." (ECF No. 55-20.)

Cecchini also claims, and Defendants deny, that Willauer took other actions against him, but Cecchini does not provide any specific dates. First, at some point in 2013, Willauer refused to issue him a bulletproof vest. (Pl.'s LRS ¶¶ 224-27; ECF No. 55-5 ¶¶ 62-63.) According to Cecchini, "Willauer stated that I missed the date for getting measured and that's why in addition to not giving a shit if I got shot he didn't give me one." (*Id.*) Cecchini then received a vest. (Def.'s LRS ¶ 227; Pl.'s LRS ¶ 227.) Second, Willauer denied Cecchini's requests for time off. (Pl.'s LRS ¶ 198.) Third, while handing out racial profiling cards at a roll call, Willauer looked at Cecchini

and said, "We all know this is bullshit." (Pl.'s LRS ¶ II.32.) Finally, Willauer was generally hostile to Cecchini, failing to acknowledging his greetings and rolling his eyes. (Pl.'s LRS ¶ 221.)

### 8. Racial Profiling Seminar (September 2013)

In September 2013, the Bloomfield Police Department sent Cecchini to a seminar in Hartford on racial profiling. (Pl.'s LRS ¶ II.26; Def.'s LRS Reply ¶ II.26.) The seminar included representatives from the NAACP, ACLU, U.S. Department of Justice, the Hartford Courant, and Channel 3 News. (*Id.*) Plaintiff claims, and Defendants dispute, that at the seminar he spoke with ACLU and U.S. Department of Justice representatives "about my concerns with racial profiling, pretextual stops, illegal searches at the Bloomfield Police Department."[4] (Pl.'s LRS ¶ II.27; ECF No. 55-5 ¶ 115.) He does not claim that anyone in the Police Department was aware of those conversations.

### 9. Lack of Promotion and Late Performance Review (Late 2013-Early 2014)

On November 3, 2013, Cecchini was not promoted to sergeant despite being eligible. (Def.'s LRS ¶ 405; Pl.'s LRS ¶ 405.) For promotions within the Bloomfield Police Department, the Town Human Resources Department and an outside consultant create a ranked eligibility list based on a written examination, oral examination, and years of service. (*Id.* ¶¶ 389-96.) The Chief of Police then interviews the three top ranked candidates and selects among them. (*Id.* ¶ 396.) The Town Manager is the final decision maker and approves those recommendations, but Town Manager Schenck has never failed to promote a candidate selected by the Chief of Police. (*Id.* ¶¶ 378-79.) Chief Hammick's practice is to select the top candidate from the eligibility list. (*Id.* ¶ 397.) According to Defendants, Hammick follows this practice unless there are extenuating

---

[4] As discussed *supra*, note 2, Cecchini's claim in his affidavit that he also spoke with the NAACP about the Bloomfield Police department is a "sham issue of fact" in direct contradiction with his sworn deposition testimony.

9

circumstances such as disciplinary problems. (*Id.*) According to Cecchini, Hammick has promoted candidates with disciplinary problems "on numerous occasions." (*Id.*)  Cecchini cites a detective, Spellman, who he claims was promoted after leaving his gun in a bathroom open to the public. (ECF No. 55-5 ¶ 34.)  On November 3, 2013, Hammick promoted the first ranked candidate on the eligibility list, Nicola Aliano, to sergeant—Cecchini was ranked third. (Def.'s LRS ¶ 405; Pl.'s LRS ¶ 405.)

Next, there was an issue with Cecchini's performance review for the rating year December 16, 2012 to December 15, 2013. (*Id.*  ¶ 297.) Cecchini's direct supervisor, Sergeant Martinez, gave Cecchini a rating of "sometimes exceeds expectations" for the rating area "quality of work." (*Id.* ¶ 302.) Then, after reviewing the rating, Hajdasz asked Fredericks to find out how Martinez reached such a rating when Cecchini had two disciplinary incidents during the rating period. (*Id.* ¶¶ 290-315; ECF No. 52-8 at 114-21.) Cecchini notes that an arrow in the copy of his performance evaluation points from "exceeds expectations" to "meets expectations" and maintains (while Defendants deny) that Hajdasz and Fredericks made the inquiry to attempt to have his score lowered. (*Id.*) On February 18, 2014, Martinez responded, among other things, that he "would have assessed Officer Cecchini either an 'Outstanding Performance' or 'Exceeds expectations', in the 'Quality of Work' category, however [he] did take into account the fact that he did have two sustained disciplines during the rating period." (ECF No. 52-8 at 119.) In the end, Cecchini's performance review did not change, although Cecchini received it late. (Def.'s LRS ¶¶ 311-13; Pl.'s LRS ¶¶ 311-13.)

### 10. Sick Time and Uniform Shirt Investigations (Late 2013-April 2014)

Some time in late 2013, at Willauer's instigation, Hammick investigated Cecchini for sick time abuse and required him to provide medical notes to substantiate his sick time absences. (*Id.*

¶¶ 319-23.) Willauer was responsible for conducting monthly reviews of sick time for everyone in the patrol division, which included noting whether officers had taken large amounts of sick leave, whether that leave was attached to days off, and whether officers had a low sick leave balance. (*Id.* ¶¶ 319-20.) In addition to Cecchini, Willauer suggested that two other officers and a sergeant be required to provide medical notes. (*Id.* ¶ 324.) Defendants claim, and Cecchini disputes, that Cecchini was suspected of abusing sick time due to his attendance record and low sick leave reserves. (*Id.* ¶ 322.)

Next, in April 2014, Cecchini was investigated due to reports of a missing uniform shirt. (*Id.* ¶ 235.) On April 16, 2014, an officer stated that he believed his uniform shirt was in Cecchini's locker. (*Id.*) Bowen sent a department-wide email asking officers to check their lockers, and on April 28, 2014, Bowen found the shirt in Cecchini's locker. (*Id.* ¶¶ 238-39.) Willauer questioned Cecchini about the shirt, and recommended that discipline should not issue. (*Id.* ¶ 241.) Hajdasz agreed with that recommendation and told Cecchini that he would not support a request for discipline. (*Id.* ¶ 242.)

### 11. Meeting with Schenck (Spring 2014)

After the uniform shirt incident, presumably later in April or early in May 2014, Cecchini met with Schenck and told him about the report of racial profiling from August 2011 and that he was afraid he was being targeted. (Def.'s LRS ¶ 245; Pl.'s LRS ¶ 245; ECF No. 52-7 at 2.) Cecchini claims that he told Schenck he was being retaliated against because of reporting Bowen's misconduct. (ECF Nos. 52-4 at 66; 55-5 ¶ 65.) According to Defendants, Schenck then spoke with Hammick about his conversation with Cecchini. (Def.'s LRS ¶ 268; Pl.'s LRS ¶ 268.) Neither party claims that the other defendants were aware of this conversation.

Schenck also stated both Cecchini and Cecchini's wife separately came to speak with him on different occasions, but neither party has provided dates for those conversations. (ECF No. 55-11 at 6-7, 12-13.) Among other things, Cecchini and his wife complained to Schenck about racial profiling in the Bloomfield police department. (*Id.*)

### 12. More Conflicts with Bowen and Willauer (May-November 2014)

In May of 2014, Cecchini made two complaints against Bowen. First, on May 19, 2014, Cecchini reported Bowen for offensive behavior and language: telling him "You look like shit, get some suspenders," "Would you mind getting the fuck away from my desk," "You're an old fuck like the rest of us… fucking granddad," and making a reference to his wife being unfaithful. (Def.'s LRS ¶¶ 250-53; Pl.'s LRS ¶¶ 250-53.) Second, on May 20, 2014, Cecchini complained that Bowen had improperly altered a police report of a motor vehicle stop, rather than supplementing the report. (*Id.* ¶¶ 271-74.)

Willauer investigated both complaints. On the first, he questioned Cecchini about whether Bowen had actually said "you look like shit" or called him a "fat shit." (*Id.* ¶ 260.) On the second, he found that Cecchini had provided false information on two occasions during the investigation. (*Id.* ¶¶ 276, 278.) Cecchini was investigated further, but received no discipline. (*Id.* ¶¶ 264-65.) Bowen, on the other hand, received a two-week unpaid suspension as discipline for the two complaints. (*Id.*; ECF No. 52-8 at 3.)

On June 5, 2014, Willauer questioned Cecchini about a report that he had thrown away a donut provided by Bowen. (Def.'s LRS ¶¶ 217-18; Pl.'s LRS ¶¶ 217-18.) Cecchini stated that he threw the donut out because it was greasy, and Willauer did not investigate further. (*Id.* ¶ 219.) Cecchini claims that Willauer directed him to write a memo on the incident. (ECF No. 55-5 ¶ 61.)

At some other time in 2014, Willauer took Cecchini's name off of a list for street survival training. (Def.'s LRS ¶¶ 194-95; Pl.'s LRS ¶¶ 194-95; ECF No. 52-4 at 31-32.) Cecchini claims, and Defendants deny, that when he asked why, Willauer stated that he "didn't care if [Cecchini] got shot." (Def.'s LRS ¶ 196; Pl.'s LRS ¶ 196; ECF No. 55-5 ¶ 56.)

### 13. Second Lack of Promotion (August 2014)

On August 3, 2014, Cecchini was ranked fifth on the sergeant promotion list, and the top three candidates were promoted. (Def.'s LRS ¶¶ 408-10; Pl.'s LRS ¶¶ 408-10.) Afterward, both the sergeant and the detective promotion list (which Cecchini was also on) were declared invalid because each had fewer than three candidates. (*Id.* ¶¶ 411-16.)

### 14. This Lawsuit and Immediate Response (November 2014)

On November 17, 2014, Cecchini filed this lawsuit. (ECF No. 1.) The Hartford Courant covered the lawsuit in an article titled "Bloomfield Police Officer Files Suit Against Department" on November 18, 2014. (ECF No. 55-25.) On November 19, 2014, Chief Hammick sent a department-wide email about the lawsuit. (Def.'s LRS ¶ 375; Pl.'s LRS ¶ 375.) In the email, Hammick stated: "While I cannot discuss the details of the legal action at this time, I can state that the Town of Bloomfield and the defendants intend to vigorously defend the accusations in this matter. In the meantime, all of us should remain focused on our responsibilities to the Town of Bloomfield and the community we serve." (ECF No. 52-9 at 1.)

At the time he filed the lawsuit, Cecchini was running for president of the police union (voting had begun on about November 14, 2014). (Def.'s LRS ¶ 332; Pl.'s LRS ¶ 332.) A sergeant and former union president named Anthony Lustrinelli contacted Fredericks about Cecchini's candidacy—Lustrinelli was concerned about Cecchini being president when he was suing other union members. (*Id.* ¶¶ 336, 340.) Fredericks told Lustrinelli to contact the union attorney, and

they decided to draft a petition for a re-vote. (*Id.* ¶¶ 344, 350-51.) Fredericks kept the petition in his office, where 29 union members signed it. (*Id.* ¶¶ 354, 363, ECF No. 52-8 at 178-79.) As a result of the petition, a new election for union president was held, and Cecchini lost. (Def.'s LRS ¶ 365; Pl.'s LRS ¶¶ 365, II.23; Def.'s LRS Reply ¶ II.23.) Fredericks kept Hammick and Hajdasz updated throughout the petition process. (Def.'s LRS ¶ 373; Pl.'s LRS ¶ 373.)

### 15. Investigations, Discipline, and Lack of Promotion (February 2015- May 2016)

In the six months following the lawsuit, Cecchini became the subject of three investigations, two of which resulted in disciplinary action. First, on February 25, 2015, Cecchini was investigated for striking a baton against the floor, but Hajdasz decided not to discipline him. (Def.'s LRS ¶¶ 142-45; Pl.'s LRS ¶¶ 142-45; ECF No. 52-6 at 16-18.)

Second, on March 20, 2015, Hammick recommended discipline for Cecchini for failure to properly care for his body mic and obey directives from Willauer about its care. (Def.'s LRS ¶ 161; Pl.'s LRS ¶ 161; ECF No. 52-6 at 53-54.) Hammick recommended a written reprimand and one-day suspension. (*Id.*) Unlike with the two disciplinary actions in 2013, this time, Cecchini requested a hearing before the Town Manager. (*Id.*) Town Manager Schenck held a hearing on April 23, 2015, and Cecchini received the recommended discipline. (Def.'s LRS ¶ 164; Pl.'s LRS ¶ 164.)

Third, on May 21, 2015, Hammick recommended discipline for Cecchini for leaving a taser unattended in a conference room in the Town Hall. (*Id.* ¶ 171, ECF No. 52-7 at 7-8.)  Hammick recommended a two-day suspension, Cecchini requested a hearing before Schenck, and Schenck imposed the suspension. (ECF No. 57-2 at 7-8.)

Then, on July 26, 2015, Hammick did not promote Cecchini to sergeant– and this (third) time, Cecchini was *higher* ranking on the list than the officer, Tiesha Thomas, who received the

14

promotion. (Def.'s LRS ¶ 420; Pl.'s LRS ¶ 420.) Defendants claim that Hammick promoted Thomas because of her superior work ethic and performance, as well as her more minor disciplinary record, which consisted of two incidents in 2013. (Def.'s LRS ¶¶ 421-25.) Cecchini claims that the motive was retaliation and that after the promotion he overhead Hammick say to Hajdasz, "If Cecchini is so worried about minorities he can work for another one," presumably referring to Thomas, who is African American. (Pl.'s LRS ¶ 386.)

On November 5, 2015, after an investigation by Fredericks, Hammick recommended discipline of Cecchini for failing to follow Bowen's order to check on the welfare of a victim of domestic violence. (Def.'s LRS ¶¶ 174-75; Pl.'s LRS ¶¶ 174-75; ECF No. 52-7 at 9-18.) Cecchini claims that he did not hear Bowen's order. (Pl.'s LRS ¶ 173.) Hammick recommended a four-day suspension, Cecchini requested a hearing before Schenck, and Schenck imposed the suspension. (Def.'s LRS ¶¶ 174-75; Pl.'s LRS ¶¶ 174-75; ECF No. 52-7 at 17-18.)

On January 11, 2016, Cecchini complained to Schenck that Bowen and another sergeant were involved in sending him "disturbing" text messages, arising out of a group text initiated by a probationary recruit who other officers believed meant to send the texts to his classmates, not various members of the department. (Def.'s LRS ¶¶ 437-43; Pl.'s LRS ¶¶ 437-43.)

On May 15, 2016, Cecchini was, for the fourth time, eligible for a promotion to sergeant, but Hammick promoted a person higher ranked on the list instead. (*Id.* ¶ 427.)

## II.   Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d

14, 18 (2d Cir. 1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000) (citation and quotation marks omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (citation and quotation marks omitted).

On summary judgment, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (citation and quotation marks omitted). However, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment," *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996), and under the "sham issue of fact" doctrine, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

### III.   Discussion

Mr. Cecchini's central claim is that the Town of Bloomfield and the defendants in their individual capacities retaliated against him for exercising his rights to free speech and petition,[5] in violation of the First Amendment to the U.S. Constitution. "A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of N.Y.*, 779 F.3d 167, 172 (2d Cir. 2015) (citation and quotation marks omitted).

### A.  Protected Speech Under the First Amendment

Cecchini bases his First Amendment claim on three activities: reports related to Bowen's August 25, 2011 motor vehicle stop; union advocacy at a February 26, 2013 disciplinary hearing; and filing this lawsuit on November 17, 2014.  All three activities are protected under the First Amendment. To determine if a public employee's speech is protected by the First Amendment, courts must consider "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 420-22 (2006)). If the court determines that the employee spoke as a citizen on a matter of public concern, "the inquiry turns to whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Lane v. Franks*, 134 S. Ct. 2369, 2373 (2014) (citation and quotation marks omitted); *see also Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968).

---

[5] Filing a lawsuit is the basis for a First Amendment claim under the Petition Clause, but it is analyzed under the same framework as claims under the Speech Clause. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011).

### 1. Reports about Bowen and Racial Profiling

First, Cecchini states that he made reports about a fellow officer, Bowen, who he claims racially profiled and illegally searched three African American men in August 2011, as well as reports about the department's lack of investigation of that incident and racial profiling in the department generally.  Defendants appear to concede for the purposes of summary judgment that the reports were on a matter of public concern. But they argue that the speech is unprotected because it was made pursuant to Cecchini's official duties as a police officer, not as a citizen.

"Guided by the Supreme Court's decision in *Garcetti*, we ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's 'official responsibilities', and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173. This determination is a "functional" and "practical" one that "is not susceptible to a brightline rule." *Id*. (citation and quotation marks omitted.) "Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (internal citation omitted).

Recent Second Circuit decisions illustrate how this determination is made in practice. For example, a school teacher's speech was *not* protected when he reported the administration's refusal to discipline a student, because a teacher's need to discipline students was essential to his day-to-day responsibilities and he followed the internal employee grievance procedure. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010). Similarly, a payroll clerk's speech was not protected when she reported pay discrepancies, because ensuring correct pay rates was part of her job responsibilities and because she reported the problem directly to her supervisors. *Ross*, 693 F.3d at 306. On the other hand, a police officer's speech *was* protected

when he voiced concerns about quota policy, because such "policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work" and because he reported it directly to precinct commanders rather than following the internal department procedures. *Matthews*, 779 F.3d at 174-75. Another police officer's speech was protected when he refused to withdraw a truthful police report and submit a false one, because "his refusals to accede to those demands constituted speech activity that was significantly different from the mere filing of his initial Report" (i.e., not part of his job duties), and because a non-employee citizen may also refuse to retract a truthful police report. *Jackler*, 658 F.3d at 241.

In this case, there is a genuine issue of material fact regarding whether Cecchini's speech about Bowen's conduct and the subsequent lack of investigation is protected under the First Amendment. Cecchini claims that he did more than simply report Bowen's misconduct in the chain of command and file an internal report per departmental procedures, as in *Weintraub* and *Ross*. Instead, he claims that he complained not only about the specific incident of misconduct, but what he "felt was a policy of racial profiling" (ECF No. 55-5 ¶ 17) and took the issue about Bowen and the department's lack of investigation to Town Manager Schenck, who, as in *Matthews*, was a leader "with whom he did not have regular interactions and who had an open door to community comments and complaints." 779 F.3d at 176. In even more obvious examples of speech following a "path that was available to ordinary citizens," *id.*, outside of his official responsibilities, Cecchini claims he discussed the incident and/or racial profiling at the Bloomfield Police Department generally with "Channel 3 reporter, Len Bensoff," the ACLU, and the U.S. Department of Justice. (ECF No. 55-5 ¶¶ 16, 115.) *See also Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 211 (E.D.N.Y. Feb. 19, 2010), *aff'd*, 415 Fed. Appx. 290 (2d Cir. 2011) ("If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain

of command at his workplace, then those external communications are ordinarily not as an employee, but as a citizen.") (citation and quotation marks omitted). Construing all facts in Cecchini's favor, these further actions would constitute protected speech.

As discussed below, however, there is no evidence that any defendant, other than Schenck and Hammick, was aware that Cecchini had reported racial profiling outside of the chain of command in the police department, and thus there is no evidence that this portion of his protected activity caused any of the adverse actions of which he complains.

### 2. *Union Advocacy*

Next, Cecchini claims that his testimony about overtime policy during a fellow officer's union disciplinary hearing in February 2013 was protected speech. Defendants agree that, "[f]or purposes of this motion only, Defendants will concede that Plaintiff's participation in the union is a protected First Amendment activity." (ECF No. 52-1 at 5 n.1.)

### 3. *This Lawsuit*

As for this lawsuit, Defendants argue that it is personal in nature and not a matter of public concern worthy of First Amendment protection. However, I have already ruled that "[t]he plaintiff's lawsuit is on a matter of public concern," (ECF No. 43 at 23) and I see no reason to depart from that decision. *See United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." (internal citations and quotation marks omitted)). As I explained in my earlier ruling, "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." (ECF No. 43 at 23, quoting *Jackler*, 659 F.3d at 236.)

### B.  Causal Connection Between Adverse Action and Protected Speech[6]

Cecchini claims that he suffered a number of adverse employment actions in retaliation for his protected speech. As best as I can discern, Cecchini specifically points to  (1) "negative and delayed and manipulated performance evaluations," (2) "denial of promotion to Sergeant on four occasions," (3) "investigations regarding the Finn uniform shirt, Bowen donuts" and "accusations that he was a liar," and (4) "retaliatory investigations and discipline since the filing of this lawsuit." (ECF No. 55 at 15-18.) Defendants do not argue that these actions were not adverse, but maintain that there is no causal connection between the adverse actions and the protected speech. I conclude that Cecchini can establish a sufficient causal connection to withstand summary judgment on two of his claims: Hammick's denying him a promotion to sergeant on July 26, 2015, and Willauer's investigations regarding the uniform shirt, donuts, and accusations of lying, between April and June 2014. The case against Fredericks, Hajdasz, and Schenck is therefore dismissed, and the First Amendment claim against Bowen is dismissed.

To demonstrate a causal connection, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 167 (2d Cir. 2006) (citation and quotation marks omitted). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). The employer must have knowledge of the protected activity in order to establish causation. *Clark Cty. Sch. Dist. v. Breeden*,

---

[6] I consider only those adverse actions that Cecchini has analyzed as such in his opposition to summary judgment. I consider any other potential claims of adverse actions to be abandoned. *See* note 1, *supra*.

532 U.S. 268, 273 (2001); *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) (summary order).

Once the plaintiff has established this prima facie case of causation, the employer may still be entitled to summary judgment based on the "*Mount Healthy* defense," "by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Id.* at 119 (citation and quotation marks omitted); *see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).

1. *Delayed performance evaluation (Hajdasz and Fredericks)*

First, there is no evidence of a causal connection between Cecchini's protected speech and his delayed performance review by Hajdasz and Fredericks in February 2014. Cecchini claims that he had "negative, delayed, and manipulated performance evaluations," but in fact he has presented evidence of a single incident of a delayed (not negative or manipulated) review.

There is no indirect showing of causation based on the timing of this delayed performance evaluation. "A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision." *Cioffi*, 444 F.3d at 168. "No bright line defines the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* (citation, quotation marks, and alterations omitted). But "[n]o plausible inference of causation based on temporal proximity can be drawn from the passage of a year or the passage of some undefined period." *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, 637 F. App'x 16, 19 (2d Cir. 2016) (summary order). And "[a]ction taken… 20 months later suggests, by itself, no causality at all." *Clark*, 532 U.S. at 274. I can find no indirect causation based on the passage of a year since Cecchini's union testimony (in February 2013). Further, there is no evidence that

Hajdasz or Fredericks was aware that Cecchini had reported racial profiling activity outside the chain of command in the Department, which is the protected component of Cecchini's racial profiling complaint under *Garcetti*. (And in any event, over two years had passed since Cecchini's initial reporting of Bowen's misconduct in August 2011.)

Cecchini has also failed to provide any direct evidence of retaliatory animus regarding his performance review. "Since a direct showing requires plaintiff to provide tangible proof of retaliatory animus, conclusory assertions of retaliatory motive are insufficient." *Smith*, 776 F.3d at 118–19 (citation and quotation marks omitted).

2. *Investigations into uniform shirt, donuts, and lying (Bowen and Willauer)*

Next, Cecchini argues that Bowen's and Willauer's investigations into his taking another officer's uniform shirt, lying in internal complaints, and throwing away Bowen's donut were substantially motivated by protected speech. I agree that there is a genuine dispute of material fact on this issue as to Willauer only.

As with the performance review, the timing of these incidents does not indicate indirect causation. The investigations took place between April and June of 2014, over a year after Cecchini's union testimony and over two years after his initial reporting of Bowen's misconduct. Cecchini's meeting with Schenck took place during this time period, but Cecchini makes no claim that either Bowen or Willauer was aware of that meeting. "Although temporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a prima facie retaliation claim, this period is measured from the date of the 'employer's knowledge of [the] protected activity.'" *Kim*, 460 F. App'x at 25 (quoting *Clark*, 532 U.S. at 273 (alteration in original)).

However, Cecchini has presented some (disputed) direct evidence of retaliatory animus on the part of Willauer. For example, Willauer told him he did "not giv[e] a shit if [Cecchini] got shot," and, at the union hearing in February 2013, Cecchini claims that Willauer said to him, "Are you ready for me?" and "Are you just going to throw shit on the wall?" (Pl.'s LRS ¶¶ 189, II.32.) Defendants have failed to provide evidence that Willauer would have pursued these investigations in the absence of Cecchini's union testimony. In other words, "a reasonable jury could find that the defendants would not have taken the same action[s]," *Cioffi*, 444 F.3d at 168, had it not been for Cecchini's protected speech.

On the other hand, Cecchini's claim that Bowen yelled, "what kind of cop rats on another cop," and pointed his gun at Cecchini in fall 2011 is not evidence of retaliatory animus for purposes of the First Amendment claim, because there is no evidence that Cecchini had reported Bowen's August 2011 motor vehicle stop outside the chain of command in the department by that time. And even if such outside reporting had taken place before fall 2011, there is no allegation that Bowen was aware of it. In light of this, there is no evidence that Bowen's comment related to anything but the internal report that Cecchini was ordered to prepare, which is not protected speech under *Garcetti.*

### 3. Denials of Promotion to Sergeant (Hammick and Schenck)

Cecchini was denied a promotion to Sergeant four times between 2013 and 2016. There is no evidence of causation for the failures to promote on November 3, 2013, August 3, 2014, and May 15, 2016. However, there is a genuine dispute of material fact as to whether Hammick denied Cecchini a promotion on July 26, 2015, in retaliation for filing this lawsuit. [7]

---

[7] Schenck also participated in the promotions process, but all claims that Schenck retaliated against Cecchini *after* the filing of this lawsuit on November 17, 2014, have already been dismissed. (ECF No. 43.)

For three of the failures to promote, there is no causation, because Cecchini has not established a prima facie case and defendants have demonstrated a non-retaliatory motive, *i.e.,* a *Mount Healthy* defense. The failures to promote on November 3, 2013, August 3, 2014, and May 15, 2016 took place nine months to over a year after the union testimony or the lawsuit, periods too long to establish a prima facie case based on temporal proximity. *See Munoz-Feliciano*, 637 F. App'x at 19.[8] And Cecchini has presented no direct evidence of retaliatory animus. Further, even if Cecchini had established a prima facie case of retaliation, "a defendant can rebut a *prima facie* showing of retaliation by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (citation and quotation marks omitted). On November 3, 2013, August 3, 2014, and May 15, 2016, Cecchini was lower-ranked on the promotion eligibility list than the person ultimately chosen, and Hammick recommended for promotion the top-ranked person, in keeping with his standard practice. (Def.'s LRS ¶¶ 397, 405; Pl.'s LRS ¶¶ 397, 405, 408-10, 427.) Schenck approved Hammick's recommendation, as was his consistent practice. (*Id.* ¶ 379.) "Plaintiffs opposing summary judgment must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the retaliatory reasons were the true reasons for discharge." *Gilligan v. Town of Moreau*, 234 F.3d 1261 (2d Cir. 2000) (unpublished disposition) (citation and quotation marks omitted). Plaintiff has offered no such evidence.

---

[8] The meeting with Schenck, in which Cecchini complained about racial profiling—outside the chain of command—took place within three to four months before the August 2014 failure to promote; but the claim still fails on the basis of the *Mount Healthy* defense, for the reasons stated in the text.

On July 26, 2015, however, Cecchini was higher ranked than the person Hammick ultimately promoted, Tiesha Thomas, and there is a genuine dispute of material fact as to whether this lack of promotion was retaliatory. As for indirect causation, eight months had passed between the filing of the lawsuit and the failure to promote. Although there is no bright-line rule of what courts in this Circuit regard as sufficient temporal proximity, this is at or beyond the outer limit. *See Cioffi*, 444 F.3d at 168 ("[T]he lapse of only several months… is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.") (internal citation, quotation marks, and alteration omitted); *Krukenkamp v. State Univ. of N.Y. at Stony Brook*, 395 F. App'x 747, 750 (2d Cir. 2010) ("A reasonable jury could find that Defendants waited six months for an opportune time to take the most visible adverse acts"); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) ("[F]ive months is not too long to support… an allegation" of a causal connection to survive summary judgment.). But Cecchini has also provided some direct evidence of retaliatory animus. Cecchini claims that he heard Hammick say, in connection with the decision to promote Thomas, "If Cecchini is so worried about minorities he can work for another one." (Pl.'s LRS ¶ 386.) Drawing inferences in Cecchini's favor, I find that Hammick's statement could have referred to this lawsuit, including its claims of racial profiling, and the promotion of Thomas, who is African American.

While defendants claim that Hammick would have promoted Thomas in the absence of Cecchini's lawsuit because of her superior work ethic, performance, and more minor disciplinary record (Def.'s LRS ¶¶ 421-25), there is also evidence that Cecchini was qualified, that promoting the top-ranked candidate was standard practice, and that Hammick had promoted at least one other candidate with a similar disciplinary record in the past. (*Id.* ¶ 397, ECF No. 55-5 ¶ 34.) "Put simply, the evidence of record before us permits only inferences. Those inferences may be drawn in either

26

party's favor, and we require more than inferences from an employer seeking summary judgment based on the *Mount Healthy* defense." *Smith*, 776 F.3d at 125.

### 4. Post-lawsuit discipline (Bowen, Fredericks, and Hammick)[9]

Cecchini also claims that defendants engaged in "retaliatory investigations and discipline since the filing of this lawsuit," and points to two specific incidents in March and November, 2015 involving care of his body mic and failure to conduct a welfare check on a victim of domestic violence. (ECF No. 55 at 17.) But the defendants have again established a *Mount Healthy* defense, showing that they would have investigated and disciplined Cecchini for both incidents even in the absence of filing this lawsuit.

To begin with, it is clear that Cecchini's lawsuit was well known in the police department: it was publicized in the Hartford Courant and Hammick sent a department-wide email about it.[10] (Def.'s LRS ¶ 375; Pl.'s LRS ¶ 375; ECF No. 55-25.) Cecchini has also presented evidence that the defendants were unhappy about the lawsuit. When reasonable inferences are drawn in Cecchini's favor, a reasonable juror could find that Fredericks organized a petition for a union election re-vote in an attempt to prevent Cecchini from becoming union president because of the

---

[9] Schenck also participated in these discipline processes, but retaliation claims against Scheck arising after the filing of this lawsuit have already been dismissed. (ECF No. 43.)

[10] Cecchini does not treat Hammick's sending of the email as an adverse action in his brief, although he does contend that the email "ostracized the plaintiff." (ECF No. 55 at 13.) Hammick's email is likely not an adverse action, because it simply announced that the department intended to contest the case, and the email itself had no direct impact on the conditions of plaintiff's employment. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) ("A plaintiff cannot support such a determination [of adverse action] unless he can show that an alleged act of retaliation is more than de minimis."). Further, to the extent that Hammick's email could be considered an adverse action, Hammick would have qualified immunity. *See Lynch v. Ackley*, 811 F.3d 569, 580 (2d Cir. 2016) ("[I]t is hardly the conventional role of the First Amendment to bar [a police chief] from exercising her free-speech rights in defense against [an employee's] attacks on her.")

lawsuit.[11] (Pl.'s LRS ¶¶ 332-73.) Fredericks, Bowen, and Willauer all signed the petition, and Fredericks kept Hammick and Hajdasz apprised of its progress. (*Id.* ¶ 373; ECF No. 52-8 at 178-79.)

With regard to the first disciplinary incident, Cecchini claims that Sergeant Christina Benvenuto (who is not a defendant in this case) "falsely accused him of failing to take proper care of his body mic" and failing to obey directives about the body mic. (ECF No. 55 at 17.) On March 20, 2015, Hammick recommended a one-day suspension as discipline. (Def.'s LRS ¶ 161; Pl.'s LRS ¶ 161.) Cecchini can establish a prima facie case of causation, because the body mic discipline took place approximately four months after he filed this lawsuit, within the range of sufficient temporal proximity. *See Cioffi,* 444 F.3d at 168. But defendants have rebutted that prima facie case with evidence that Hammick "would have taken the same adverse employment action even in the absence of the protected conduct." *Smith*, 776 F. 3d at 119 (citation and quotation marks omitted). Bloomfield police officers are required to wear body mics in their pockets and test them at the beginning of their shifts, and Cecchini had notice of these requirements. (Def.'s LRS ¶¶ 147-48, 150; Pl.'s LRS ¶¶ 147-48, 150; ECF No. 52-6 at 19, 23.) According to Benvenuto's disciplinary memorandum, Cecchini had failed to properly care for the body mic on three occasions—and Cecchini admits to misplacing it on two occasions. (Pl.'s LRS ¶ 158; ECF No. 52-6.) Cecchini had also been warned at least twice about his failure to care for the body mic: Willauer emailed

---

[11] Cecchini also does not treat the union petition as an adverse employment action in his brief. In any event, the petition is likely not an adverse action, because it related to the Cecchini's status in the union, not any discipline, benefits, or rank in his position as a police officer. *See Zelnik*, 464 F.3d at 225-26.

Cecchini (cc'ing Benvenuto) directing that the body mic "whether assigned or borrowed, is not to be left in the cruiser," and Benvenuto told Cecchini to wear the body mic in his pocket. (Def.'s LRS ¶ 156; Pl.'s LRS ¶ 156; ECF No. 52-6 at 22.) Benvenuto also requested discipline for two other officers for failing to comply with body mic directives. (Def.'s LRS ¶ 160; Pl.'s LRS ¶ 160.)

Further, even if Benvenuto herself *had* acted out of retaliation, once Hammick received information about Cecchini's failure to care for the body mic and obey directives, that information provided a legitimate, non-retaliatory reason to discipline him in the form of a written warning and one-day suspension. Benvenuto's motivations are immaterial, as she is not a defendant in this case and there is no evidence that Hammick was aware of them.

With regard to the second disciplinary incident, Cecchini claims that Bowen made a "false complaint" that he had failed to follow Bowen's order to conduct a welfare check on a victim of domestic violence. Fredericks investigated the complaint, and on November 5, 2015, Hammick recommended a four-day suspension. (ECF No. 55 at 17; Def.'s LRS ¶¶ 174-75; Pl.'s LRS ¶¶ 174-75.) Cecchini cannot establish that Bowen's, Fredericks' or Hammick's actions related to the welfare check incident were substantially motivated by retaliation. The welfare check discipline took place almost one year after the initial complaint was filed in this case. Typically, "[n]o plausible inference of causation based on temporal proximity can be drawn from the passage of a year." *Munoz-Feliciano*, 637 F. App'x at 19.

In any event, there is evidence that Fredericks, Hammick, and Bowen would have taken the same actions even in absence of the protected conduct. Fredericks investigated the complaint because he was assigned to do so. (ECF No. 52-7 at 10.) He interviewed all officers and dispatchers present at the roll call, including Cecchini. (Def.'s LRS ¶ 175; Pl.'s LRS ¶ 175.)  It was undisputed that Cecchini did not conduct the welfare check in question, but Cecchini claims that he did not

hear Bowen's order. (*Id.* ¶ 176.) According to Fredericks' investigation, officers present recalled that a welfare check was assigned at the specific address. (ECF No. 52-7 at 12-13.) Some officers stated that they recalled Bowen asking Cecchini to do a welfare check, while others stated that they did not recall whether he asked Cecchini specifically. (*Id.*; Def.'s LRS ¶ 176; Pl.'s LRS ¶ 176.) Fredericks concluded that because the specific address was within Cecchini's district, it was Cecchini's responsibility to conduct the welfare check. (ECF No. 52-7 at 15.) On the legitimate, non-retaliatory basis of information gleaned through the interviews, Fredericks found Cecchini to have shown inattentiveness to duty or assignment and failure to comply with a lawful order. (*Id.* at 16.)  Cecchini has offered no evidence "to support a rational finding that the legitimate" reason was false, and that instead Fredericks was motivated by retaliation. *Gilligan*, 234 F.3d 1261 (citation and quotation marks omitted).

Similarly, once Hammick had received Fredericks' investigation and conclusions, he too had a legitimate, non-retaliatory reason for imposing a four-day suspension. Cecchini has failed to provide any evidence to demonstrate that this reason was pre-textual, making only the conclusory statement that he "was disciplined in retaliation for his First Amendment Speech." (Pl.'s LRS ¶ 179.)

As for Bowen, according to Bowen and many of the officers interviewed by Fredericks, Bowen did order the welfare check, and made the complaint due to the serious safety concerns associated with not checking on a domestic violence victim. (Def.'s LRS ¶ 176; ECF No. 52-7 at 12-13.) Cecchini, on the other hand, claims in his affidavit that Bowen "set me up so that he could get me disciplined." (ECF No. 55-5 ¶ 51.) He also claims that Bowen "met with each witness at roll call prior to the interview with Fredericks and spoke to them of the incident in a suggestive manner to get them to state that they heard him give the direction." (*Id.* ¶ 52.) But Cecchini cannot

rely on conclusory statements, statements not based on personal knowledge, and statements unsupported by evidence to rebut Bowen's non-retaliatory reason for making the complaint. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") Therefore, he cannot rebut Bowen's *Mount Healthy* defense.

### C.  Qualified Immunity for Individual Defendants

Defendants also seek dismissal of the First Amendment claims brought under 42 U.S.C. § 1983 on the grounds of qualified immunity. "Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).  "[T]he very action in question need not have been the subject of a holding in order for a right to be clearly established.  If the contours of the right are sufficiently clear, then officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Nagle*, 663 F.3d at 115–16 (internal citations, quotation marks, and alteration omitted).

Defendants argue that it was objectively reasonable to believe that their actions in response to Cecchini's protected speech did not violate his rights.[12] I disagree. The Second Circuit has held that, "[w]here specific intent of a defendant is an element of plaintiff's claim under clearly

---

[12] Defendants also argue that it was not clearly established that Cecchini's complaints regarding Bowen were protected speech. However, I need not address that issue, because the only First Amendment claims remaining in the case are that Willauer retaliated against Cecchini for his union testimony and that Hammick retaliated against Cecchini for filing this lawsuit.

established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." *Mandell*, 316 F.3d at 385. In a case such as this one, "retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against defendant[s] [Bowen, Hammick, and Willauer] cannot be dismissed on qualified immunity grounds." *Id.* Because the central issue here is the causal connection, i.e., retaliatory animus, the case is distinct from *Lynch*, 811 F.3d 569, where the defendant received qualified immunity when she exercised her own First Amendment rights to defend against attack and because she was potentially entitled to retaliate under *Pickering*, 391 U.S. 563.

### D.  Liability of the Town of Bloomfield

Defendants next argue, and I agree, that the Town of Bloomfield[13] cannot be held liable for the actions of its employees under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 691.

---

[13] Cecchini included the Town of Bloomfield, along with the other defendants, in the First Amendment claims in Counts One and Six of his second amended complaint. (ECF No. 28.) Cecchini also made separate First Amendment and Fourteenth Amendment claims against the Town in Count Three. (*Id.*) Because Cecchini withdrew the Fourteenth Amendment claim prior to my ruling on the Motion to Dismiss (ECF No. 43 at 26), and because the First Amendment claim is duplicative of the claims in Counts One and Six, I treat Count Three as dismissed.

Cecchini argues that the Town of Bloomfield is liable because Hammick is a final policy maker under *Monell*. [14] This is incorrect. It is well established that "only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (citation omitted). (citation, quotation marks, and alteration omitted). "[T]he official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's business." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000).

In this case, Hammick was not the final policymaker in the relevant area of business: personnel and promotions decisions within the Bloomfield police department. Although Hammick had discretion in making recommendations regarding promotions, "[i]t does not suffice for these purposes that the official has been granted discretion in the performance of his duties." *Id.* Hammick's promotion decisions were not final, but rather "subject to review by the municipality's authorized policymaker[]," Schenck. *Praprotnik*, 485 U.S. at 127. (*See* Def.'s LRS ¶¶ 378-79; Pl.'s LRS ¶¶ 378-79.) *See also Albert v. City of Hartford*, 529 F. Supp. 2d 311, 330-31 (D. Conn. 2007) (Police Chief "had the discretionary authority to recommend decisions regarding the hiring and firing of employees, but was constrained by policies set forth in the Personnel Rules, the Court of Common Council and the City Manager." "It is this presence of review mechanisms that prevents [the Chief of Police] from being a final decision maker.")

Cecchini also argues that the Town of Bloomfield is liable for the persistent and widespread misconduct of its non-policy making employees. Municipal liability can be established if the acts

---

[14] Cecchini also argues that Schenck is a final policy-maker, but there is no remaining claim against Schenck in his individual capacity that could make the Town of Bloomfield liable.

were "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012). There is no such evidence here.

### E.  Intentional Infliction of Emotional Distress

Finally, Defendants argue that Cecchini's state law claim of intentional infliction of emotional distress against Bowen is time-barred.  I agree.[15] Tort actions in Connecticut have a three year statute of limitations. Conn. Gen. Stat. § 52-577. Under the continuing course of conduct doctrine, "the termination of the conduct provides the most sensible time at which to commence the running of the limitations period." *Watts v. Chittenden*, 301 Conn. 575, 598, n.4 (2011). The Connecticut Supreme Court has reasoned that this doctrine applies in intentional infliction of emotional distress cases because "it [would] be unreasonable to require a plaintiff to bring separate causes of action during the limitations period after each extreme and outrageous incident giving rise to the claim." *Id.* Here, *both* times that Bowen pointed a gun at Cecchini occurred more than three years before Cecchini filed the lawsuit on November 17, 2014—the  first before August 2011, and the second within 30 days after August 25, 2011.[16] In other words, every "extreme and outrageous incident" occurred outside of the statute of limitations period, and the claim is time-

---

[15] In fact, Cecchini does not contest the statute of limitations issue in his opposition brief.

[16] In his affidavit, Cecchini states that this incident took place sometime after Thanksgiving 2011. (ECF No. 55-5 ¶ 9.) However, this is directly contradicted by Cecchini's deposition testimony that the incident was "within" a "30-day span" of when "[t]he complaint was made," *i.e.* August 25, 2011. (ECF No. 52-4 at 19.) Therefore I must disregard the affidavit statement under the "sham issue of fact" doctrine. *See* note 2, *supra.*

barred. The evidence in the record regarding Bowen's remaining conduct falls far short of the "extreme" and "outrageous" conduct required for intentional infliction of emotional distress.

**IV.    Conclusion**

For the reasons discussed above, the defendants' motion for summary judgment (ECF No. 52) is GRANTED in part and DENIED in part. The case against Bowen, Fredericks, Hajdasz, Schenck, and the Town of Bloomfield is dismissed. The case may proceed only as to Cecchini's First Amendment claims that: (1) Willauer investigated Cecchini between April and June 2014 in retaliation for his February 2013 union testimony (included in count one of the second amended complaint), and (2) Hammick denied Cecchini a promotion in July 2015 in retaliation for filing this lawsuit in November 2014 (included in count six of the second amended complaint).

The parties shall file their joint trial memorandum within 45 days. A jury trial is scheduled for July 12, 2017. Should the parties wish to proceed to mediation, they shall jointly file a statement within 14 days, certifying that (1) counsel have conferred with their clients and each other, (2) the parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts in good faith, and (4) counsel believe that a mediation stands at least a reasonable chance of resolving the case without trial. If they file such a statement, the Court will postpone the deadline for the filing of the joint trial memorandum until June 12, 2017.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 7, 2017